UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN DOE,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>X CORP., et al.,<br><br>　　　　Defendants. | Case No. 25-cv-07597-TLT<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO TRANSFER**<br><br>RE: DKT. NO. 7, 23, 24 |

From Palm Beach to San Francisco, this case has traveled quite the distance. Its final stop is Texas. There, the parties will be afforded the opportunity to litigate in the forum where this case belongs.

Before the Court is Defendants' motion to transfer the case to the U.S. District Court for the Northern District of Texas. ECF 24. In its discretion, the Court determined the motion was suitable for decision without oral argument under Civil Local Rule 7-1(b) and therefore vacated the hearing set for November 4, 2025. ECF 39.

Having considered the parties' briefs, the relevant legal authority, and for the reasons below, the Court **GRANTS** the motion to transfer venue and thus refers the motion for preliminary injunction and administrative motions to file sur-replies to the U.S. District Court for the Northern District of Texas for resolution.

**I.　BACKGROUND**

　　**A.　Procedural History**

On August 28, 2025, Plaintiff John Doe ("Plaintiff") filed a complaint and an *ex parte* motion for injunctive relief against Defendants X Corp. and xAI Corp. (collectively, "Defendants") in state court for Palm Beach County, Florida, for alleged violations of 15 U.S.C. §

6851 (the "NCII Statute"). ECF 16-1. The Florida state court denied his request without prejudice on September 2, 2025. ECF 16-2. Plaintiff voluntarily dismissed his Florida case on September 4, 2025. ECF 16-3. Two days later, on Saturday, September 6, 2025, Plaintiff re-filed his case in the Court. ECF 1.

On September 9, 2025, Plaintiff filed an *ex parte* motion for injunctive relief accompanied by a request to proceed under a pseudonym under 15 U.S.C. § 6851(b)(3)(B). ECF 9. The following day, the Court denied Plaintiff's request for a temporary restraining order without prejudice, ordering Plaintiff to provide notice of his complaint and motion to Defendants. ECF 12. Plaintiff served Defendants the following day. ECF 14. In accordance with the Court's scheduling order, Defendants filed a response on September 15, 2025. ECF 16. Plaintiff filed a reply on September 18, 2025. ECF 19.

On September 24, 2025, Defendants filed a motion to transfer the case to the Northern District of Texas. ECF 24. Plaintiff filed a response on October 8, 2025. ECF 31. Defendants filed a reply on October 15, 2025. ECF 36. The Court found the matter suitable for decision without oral argument and vacated the previously set hearing on Defendants' motion. ECF 39.

**B.     Factual Background**

In October 2022, Congress enacted the Reauthorization of the Violence Against Women Act. 15 U.S.C. § 6851. In it, Congress granted a civil remedy for victims of non-consensual disclosure of their intimate images. *Id.*

Plaintiff is a content creator on OnlyFans. *Id.* ¶ 37. OnlyFans is a subscription-based platform in which creators create adult content for subscribers to view. Compl. ¶ 34. As a creator, Plaintiff posts "intimate visual depictions," "sexually explicit conduct," and/or "commercial pornographic content" on his account for subscribers to view. *Id.* ¶ 40.

Plaintiff, and subscribers who view his content, agree to the OnlyFans terms of service when they register an account. *Id.* ¶ 37–38. Plaintiff alleges that his content was copied from his OnlyFans account without Plaintiff's consent in violation of OnlyFans's terms of service. *Id.* ¶ 40. Plaintiff contends that subscribers who copied and reposted Plaintiff's images "misrepresented

their willingness to comply with the acceptable use policy and terms of service," and thereby "fraudulently gained access to [Plaintiff's] intimate images." *Id.* ¶ 48.

Plaintiff's content also appears in "Studio Pornography" which is commercial pornography that was produced by a studio—in this case by Falcon Studios, SayUncle, Pride Studios, and ASG Max. *Id.* ¶ 50. Viewers who access Plaintiff's content on these studios agree to the terms of service of the studios which prohibits copying and republishing intimate visual depictions from their website onto other platforms. *Id.* ¶ 51.

Plaintiff alleges that these copied images were posted on X "and then disclosed, as defined by the NCII Statute, by X to its users." Compl. ¶ 56. Plaintiff further alleges that X did not obtain his consent to disclose his intimate images on X's platform and that, after he reported the NCII disclosures to X, X was aware that he did not consent to the disclosures. *Id.* ¶¶ 59–62.

Plaintiff alleges xAI trained its artificial intelligence model by "feeding it data and content" which included his NCII disclosed on X. *Id.* ¶¶ 83, 86. He further alleges that he did not consent to the disclosure of his NCII to xAI by X. *Id.* ¶ 88.

Plaintiff seeks injunctive relief on behalf of himself and a class of:

> All persons whose intimate visual depiction and/or sexually explicit conduct, as defined in the NCII Statute, was disclosed, as defined in the NCII Statute, by X (formerly Twitter) or xAI without consent, where such disclosure was made by X or xAI with knowledge that there was no consent or with a reckless disregard as to whether there was a lack of consent to such disclosure, from October 1, 2022 to the present.

*Id.* ¶ 113. Plaintiff seeks actual and statutory damages under 15 U.S.C. § 6851(b)(3)(A)(i) in the amount of $150,000, an injunction under 15 U.S.C. § 6851(b)(3)(A)(ii); and an award of attorneys' fees and costs under 15 U.S.C. § 6851(b)(3)(A)(i).

Regarding Plaintiff's injunctive relief, he seeks an order requiring X to, "within 12 hours, cease disclosure and display of all visual depictions, including images, GIFs, and videos." ECF 7 at 2. Plaintiff requests that, if X is able to "discern between intimate visual depictions and non-intimate visual depictions with the highest possible accuracy rate reasonably obtainable in the industry," then X must "cease disclosing all intimate visual depictions within 12 hours of receiving the Court's order." *Id.* at 2–3. In his reply brief, Plaintiff requested that this Court,

3

1  should it find the requested relief too broad, "fashion the appropriate remedy and methods to
2  accomplish having the defendant cease display or disclosure of all nonconsensual intimate images
3  currently on its platform." ECF 19 at 5.
4      Plaintiff requests that "xAI shall halt the functioning of xAI's systems, servers, AI models,
5  and/or any other element of its business within 12 (twelve) hours of receiving this Court's order
6  … in all forms…." *Id*. at 5. Alternatively, "if xAI is immediately capable of decerning [sic]
7  between intimate visual depictions and non-intimate visual depictions…, then xAI shall only halt
8  the functioning of those elements of its systems, serves, AI models and/or other element of its
9  business which have been trained on and/or exposed to and/or disclosing and/or in possession of
10 intimate visual depictions." *Id.*
11     On September 14, 2025, at 3:06 a.m. PST Defendants received the identity of Plaintiff.
12 ECF 16 at 14. Plaintiff also identified the X accounts that had allegedly posted images of him on
13 X without his consent. *Id.* X states that it suspended those accounts the same day and that the
14 content at issue is no longer accessible to the public on X. *Id*; *see* Fernandez Dec. ¶ 6. Plaintiff
15 alleges that as of September 18, 2025, Plaintiff's NCII was still being disclosed by X. ECF 19 at
16 13.
17     Since X Corp., or its predecessor-in-interest, Twitter, Inc., was launched in 2006, the
18 company has revised the Terms of Service several times. Declaration of Megan Scolari ("Scolari
19 Dec.") ¶ 6. During a one-month period between October 16, 2024, and November 15, 2024,
20 Defendants displayed a banner across the top and middle of Defendants' website presenting the
21 latest version ("Version 20") of X's Terms of Service. ECF 24 at 2.
22     The new Terms of Service also received media coverage from popular news organizations.
23 Scolari Dec. ¶ 15 n.1. To sign into X, a user is met with a webpage which prompts the user to
24 "Sign up," "Create account," "Sign in," or "Get the app." Scolari Dec. ¶ 7. Except for the button
25 to create an account, the buttons on this webpage appear in black font in the center of a gray oval
26 which encompass the text. *Id.* The words appear against a white backdrop within the oval, the
27 same color as the backdrop of the webpage itself. *Id.* The colors of the "Create account" oval are
28 inverted—the font is white and the text is presented at the center of a black oval. *Id.*

4

1  Just below the "Create account" button is a sentence in slightly smaller font which reads:
2  "By signing up, you agree to the Terms of Service and Privacy Policy including Cookie Use." *Id.*
3  The words "Terms of Service," "Privacy Policy," and "Cookie Use" appear in blue font, while the
4  remaining words appear in black font. *Id.* The "Terms of Service" text is a hyperlink which takes
5  users to the latest version of X's terms of service. Those terms include a provision which reads:

> The laws of the State of Texas, excluding its choice of law provisions, will govern these Terms and any dispute that arises between you and us, notwithstanding any other agreement between you and us to the contrary. All disputes related to these Terms or the Services, including without limitation **disputes related to or arising from other users' and third parties' use of the Services** and any Content made available by other users and third parties on the Services, **will be brought exclusively in the U.S. District Court for the Northern District of Texas** or state courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum. Without prejudice to the foregoing, you agree that, in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim. To the extent permitted by law, you also waive the right to participate as a plaintiff or class member in any purported class action, collective action or representative action proceeding.

X Corp. Terms of Service, effective November 15, 2024, at § 6 (emphasis added). Defendants argue that the forum selection clause embedded in this provision compels this Court to transfer Plaintiff's case to the Norther District of Texas for adjudication.

**II.     LEGAL STANDARD**

A forum selection clause "may be enforced through a motion to transfer under [28 U.S.C.] § 1404(a)." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 59 (2013). Section 1404(a) provides that a case may be transferred "[f]or the convenience of parties and witnesses, in the interest of justice," to "any other district . . . where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "[A] proper application of § 1404(a) requires that a forum-selection clause be given controlling weight in all but the most exceptional cases." *Atl. Marine*, 571 U.S. at 59–60 (internal quotation marks omitted)

5

Defendants bear the burden of demonstrating the existence of a contract and the inclusion of the forum selection clause in that contract. *Kedkad v. Microsoft Corp.*, No. 13-cv-0141, 2013 WL 4734022, at *3 (N.D.Cal. Sept. 3, 2013). The presence of a valid forum-selection clause requires district courts to adjust their usual § 1404(a) analysis in three ways." *Atl. Marine*, 571 U.S. at 62. "First, the plaintiff's choice of forum merits no weight." *Id.* at 63. "Second, a court evaluating a defendant's § 1404(a) motion to transfer based on a forum-selection clause should not consider arguments about the parties' private interests." *Id.* at 64. Third, only public-interest factors remain, and those rarely override the parties' agreement. *Id*. Therefore, "[w]here there is a forum-selection clause . . . the plaintiff bears the burden of showing why the court should not transfer the case to the agreed-upon forum, and the court "should not consider arguments about the parties' private interests." *Id*. at 64. Under a forum selection clause, the court "may consider arguments about public-interest factors only." *Id.* "Because public-interest factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.* at 64.

### III. DISCUSSION

X's Terms of Service, Defendants argue, warrant disputes regarding Plaintiff's request for relief to be resolved in the Northern District of Texas. ECF 24 at 1. Plaintiff disputes the existence of a valid contractual relationship which would compel his claims to be heard outside of this district, or, in the alternative, that "exceptional" and "unusual" circumstances overcome any contractually valid forum selection clause. ECF 31 at 6. For this Court to grant Defendants' motion, Defendants must show that (A) X's forum selection clause is valid, (B) Plaintiff's claims are subject to the forum selection clause, and (C) no extraordinary public-interest considerations weigh against enforcement of the forum selection clause.

#### A. Defendants' Forum Selection Clause is Valid

Before the court may consider the impact of any forum selection clause, it must first determine whether a contract exists and, if so, whether it contains the forum selection clause at issue. *Kedkad v. Microsoft Corp.*, No. 13-cv-0141, 2013 WL 4734022, at *3 (N.D.Cal. Sept. 3, 2013) ("Before the court can apply federal law to the interpretation and enforcement of a forum

1  selection clause, however, it must, as a threshold issue, determine whether a forum selection
2  clause exists.").

### i. Plaintiff Assented to Version 20 of X's Terms of Service

Plaintiff argues that the revised forum selection clause should not be enforced because it constitutes a modification to a prior contractual agreement to which Plaintiff has not agreed. ECF 31 at 12. Defendants argue that Plaintiff's continued use of X establishes his assent to X's Terms of Service. ECF 24 at 6.

Federal courts apply state-law principles of contract formation. *Berman v. Freedom Financial Network*, LLC, 30 F.4th 849, 855 (9th Cir. 2022). "To form a contract under California law, there 'must be actual or constructive notice of the agreement and the parties must manifest mutual assent.'" *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 923 (N.D. Cal. 2024) (quoting *Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 512–13 (9th Cir. 2023)). Modifications to existing contract require the same "assent" for a revision that the existing contract required; consent from both parties for the modifications must be obtained. *Douglas v. U.S. Dist. Court for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007).

Online agreements fall on a spectrum ranging from "clickwrap" to "browsewrap." *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 923 (N.D. Cal. 2024). "[C]lickwrap" agreements are agreements in which a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating, "I agree" in order to proceed." *Id.* On the other side of the spectrum, "are agreements in which a website offers terms that are disclosed only through a hyperlink and the user supposedly manifests assent to those terms simply by continuing to use the website." *Id.* Both are enforceable, but courts are more reluctant to enforce browsewrap agreements. *Id.* Courts have also identified a third category of online agreements: a sign-in wrap. In a sign-in wrap, or a "modified clickwrap agreement," a user is "notified of the existence of the website's terms of use and advise[d] that by making some type of affirmative act, often by clicking a button, she is agreeing to the terms of service." *Id*. However, regardless of how X's Terms of Service are characterized—clickwrap, browsewrap, or sign-in wrap—"the same inquire [sic] notice test applies." *Id.* Under California law, online agreement

7

1   may be an enforceable contract based on inquiry notice if "(1) the website provides reasonably
2   conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes
3   some action, such as clicking a button or checking a box, that unambiguously manifests his or her
4   assent to those terms." *Id.* (quoting *Berman*, 30 F.4th at 856)).

### 1. Version 20 of X's Terms of Service Provided Reasonably Conspicuous Notice to Plaintiff

To be conspicuous, notice "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856; *see also B.D. v. Blizzard Ent., Inc.*, 76 Cal. App. 5th 931, 936 (2022) (finding "Blizzard's popup notice provided sufficiently conspicuous notice" of an arbitration agreement to bind Plaintiff). The analysis involves a "a fact-intensive inquiry of largely subjective criteria, such as the size, color, contrast, and location of any text notices; the obviousness of any hyperlinks; and overall screen "clutter." *Id.* at 947 (quotations and internal citation omitted). While terms may be disclosed through hyperlinks, the presence of a hyperlink "must be readily apparent," and "[s]imply underscoring words or phrases . . . will often be insufficient to alert a reasonably prudent user that a clickable link exists." *Ghazizadeh*, 737 F. Supp. 3d at 924. "The context of the transaction is a non-dispositive factor under California law, used to evaluate whether a website's notice is sufficiently conspicuous. Courts must still evaluate the visual aspects of the notice under the two-part test [the Ninth Circuit] articulated in *Berman*." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1019 (9th Cir. 2024).

Here, during a one-month period between October 16, 2024, and November 15, 2024, Defendants displayed a banner across the top and middle of Defendants' website presenting Version 20 of X's Terms of Service. ECF 24 at 2. While the presentation of the banner alone is not enough to satisfy the notice requirement, *Ghazizadeh*, 737 F. Supp. 3d at 924, the Court considers the factor to weigh Defendants' favor. Plaintiff initially created a Twitter account in December 2022. Declaration of John Doe ("Doe Dec.") ¶ 2. Plaintiff had access to his account from the time to which X published and displayed Version 20 of X's Terms of Service and the time those terms went into effect. Scolari Dec. ¶ 13. Moreover, X's revised Terms of Service

8

received media coverage from several popular news organizations. Scolari Dec. ¶ 15 n.1. The public exposure of X's changes increases the probability that a reasonable consumer of X's services would have been aware of the latest version of the company's Terms of Service.

Finally, on the sign-in page of Defendants' website, a user is met with a webpage which prompts the user to "Sign up," "Create account," "Sign in," or "Get the app." Scolari Dec. ¶ 7. Most of the buttons on this webpage appear in black font in the center of a gray oval which encompasses only the text. *Id.* Below the "Create account" button is a sentence in slightly smaller font which reads: "By signing up, you agree to the Terms of Service and Privacy Policy including Cookie Use." *Id.* The phrases "Terms of Service," "Privacy Policy," and "Cookie Use" appear in blue font, while the remaining words appear in black font. *Id.* The "Terms of Service" text is a hyperlink which takes users to the latest version of X's terms of service. *Id.* Those terms include a provision which reads: "All disputes related to these Terms or the Services, including without limitation disputes related to or arising from other users' and third parties' use of the Services and any Content made available by other users and third parties on the Services, will be brought exclusively in the U.S. District Court for the Northern District of Texas or state courts located in Tarrant County, Texas, United States, and you consent to personal jurisdiction in those forums and waive any objection as to inconvenient forum." X Terms of Service, Version 20, § 6. The hyperlink is noticeable on the sign in webpage; the text is the only text that appears in color and appears at the center—not at the bottom or in a corner—of the screen. A user's attention is naturally drawn to the hyperlink as it sits colorfully sandwiched between the button prompting a user to create an account and the button prompting a user to sign into an account.

Taken together, the banner X displayed during a month-long period of notice, the noticeable font color and presentation of the Terms of Service hyperlink, and, unique to this case, the media coverage surrounding X's updated terms, the Court finds that Defendants have satisfied the notice requirement at the first step of the test articulated in *Berman.*

### 2. Plaintiff Assented to Version 20 of X's Terms of Service

"A user's click of a button can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and

9

conditions of an agreement." *Ghazizadeh,* 737 F. Supp. 3d at 923–24 (N.D. Cal. 2024) (citing Berman, 30 F.4th at 857). That is to say, the notice must inform the user of "the legal significance of the action she must take to enter into a contractual agreement." *Id*. at 929.

Both the current and previous versions of X's Terms of Service state that X may revise X's Terms of Service and that "[b]y continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms." Scolari Dec. ¶¶ 10, 14; X Terms of Service, Version 19, § 6. As discussed above, Plaintiff initially created a Twitter account in December 2022. Doe Dec. ¶ 2. In the process of doing so, Plaintiff agreed to and was bound by the then-existing Terms of Service. ECF 36 at 3. Plaintiff does not dispute this. ECF 31 at 11. Thereafter, according to the explicit terms of the contract Plaintiff agreed to, continued use of the platform manifested his assent to the Terms of Service as they were revised. According to Defendants, Plaintiff continued to use and post to X even as recently as October 9, 2025. Declaration of Jolie Peral ("Perla Dec.") ¶ 2. Plaintiff's continued use of X after he created the account, and through the proceedings of this litigation demonstrate his assent to Version 20 of X's Terms of Service.

\* \* \*

While Version 20 of X's Terms of Service did include a change in contractual terms, the Court finds that Plaintiff was on notice of this change and assented to the revised Terms of Service when he continued to use the website. Courts across the country have repeatedly upheld X's forum selection clause as valid and enforceable. *See Don't Tread On Us, LLC v. Twitter, Inc*., 2023 WL 7277183, at \*4 (S.D. Fla. May 19, 2023) (finding Twitter, Inc.'s Terms of Service's forum selection clause "valid and enforceable"); *see Trump v. Twitter, Inc*., 2021 WL 8202673, at \*5 (S.D. Fla. Oct. 26, 2021) (colleting collecting cases where Twitter's Terms of Service's forum selection clause was enforced). More recently, a federal district court validated the forum selection clause provided in Version 20 of X's Terms of Service and transferred the litigation in that case to the Northern District of Texas. *See Williams v. X Corp*., No. 25-cv-00058, 2025 WL 2801626, at \*4 (S.D. Ala. Oct. 1, 2025).

The Court finds that Defendants' revised forum selection clause is a valid and enforceable

contract modification.

### B. Plaintiff's Claims are Encompassed by the Forum Selection Clause

Next, the Court must discern the scope of Defendants' forum selection clause. Plaintiff contends that the forum selection clause is invalid and unenforceable and does not address the scope of the forum selection clause. ECF 31. Defendants argue that Plaintiff's claims fall directly within the clause's scope. ECF 24 at 6.

"A forum-selection clause applies only to claims within its scope." *Cornet v. Twitter, Inc.*, No. 3:22-cv-06857, 2023 WL 3029236, at *3 (N.D. Cal. Apr. 19, 2023) (citation omitted). "[F]orum-selection forum-selection clauses covering disputes relating to a particular agreement apply to any disputes that reference the agreement or have some logical or causal connection to the agreement." *Yei A. Sun v. Adv. China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018) (quotations omitted). "The dispute need not grow out of the contract or require interpretation of the contract in order to relate to the contract." *Id.*

Plaintiff challenges conduct that falls well within the types of disputes covered by X's terms of service. Specifically, Plaintiff claims that his images were posted on X by third parties "and then disclosed, as defined by the NCII Statute, by X to its users." *Id.* Plaintiff further alleges that xAI trained its artificial intelligence model by consuming data disclosed to the model by X which included his NCII disclosed on X. *Id.* ¶¶ 83, 86. His claims involve "disputes related to or arising from other users and third parties' use of the Services and any Content made available by other users … on the Services." X TOS § 6. Thus, the forum selection clause encompasses Plaintiff's claims.

### C. Exceptional Circumstances Do Not Outweigh Enforcement of X's Forum Selection Clause

The Court may still reject enforcement of Defendants' forum selection clause if the Court finds that, as Plaintiff argues, other factors which govern the § 1404(a) analysis weigh in favor of keeping the case in this district. ECF 31 at 17.

The presence of a forum selection clause is a "significant factor" in the court's § 1404(a) analysis. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499 (9th Cir. 2000). However, "the

1  existence of a forum selection clause cannot be dispositive on a motion for transfer." 15 Fed.
2  Prac. & Proc. Juris. § 3854.1 (4th ed.).  Even if a "forum selection clause designates [a transferee
3  district] as the exclusive forum, the court [may] determine[] that other factors 'clearly'
4  demonstrate[] that California [is] more appropriate." *Jones*, 211 F.3d at 499.

5  In conducting that analysis "[w]hen parties agree to a forum-selection clause, they waive
6  the right to challenge the preselected forum as inconvenient or less convenient for themselves or
7  their witnesses, or for their pursuit of the litigation." *Atl. Marine*, 571 U.S. at 64.  Thus, only
8  "extraordinary circumstances unrelated to the convenience of the parties" can override the forum-
9  selection clause.  *Id.* at 62.  In other words, the Court "should not consider arguments about the
10 parties' private interests," and "[a]s a consequence, a district court may consider arguments about
11 public-interest factors only." *Id*. at 64.

12 "Public-interest factors may include 'the administrative difficulties flowing from court
13 congestion; the local interest in having localized controversies decided at home; [and] the interest
14 in having the trial of a diversity case in a forum that is at home with the law.'" *Id*.; *see also*
15 *Cooper v. Slice Techs., Inc.*, No. 17-cv-02340, 2017 WL 4071373, at *4 (N.D. Cal. Sept. 14,
16 2017) ("This inquiry weighs the public-interest factors that the Supreme Court and the Ninth
17 Circuit have identified: local interest in the lawsuit, familiarity with the governing law, burden on
18 the courts, and costs.").  The Court addresses these interests below.

19 Defendants provide compelling statistics related to the costs and burden of litigation on the
20 courts:

> As of June 25, 2025, there were 1,034 pending actions per judgeship in this Court. In contrast, there are only 552 pending actions per judgeship in the Northern District of Texas. The lighter caseload in the Northern District of Texas also translates to a dramatically shorter median time from filing to disposition in that court for civil cases, 5.8 months, as compared to the same statistic for this Court, 20.5 months. And the median time from filing to trial for civil cases in the Northern District of Texas is 24.4 months, as compared to 37.6 months for this Court.

26 ECF 24 at 8.  The purpose of § 1404(a) is to "prevent the waste of time, energy, and money, and to
27 protect litigants, witnesses and the public against unnecessary inconvenience and expense." *Van*
28 *Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (internal quotation marks omitted).  Considering the

1  goal of § 1404 (a) and the trends shared in support of this motion, the Court finds that the Northern
2  District of Texas has a greater capacity to expeditiously resolve Plaintiff's motion.  Accordingly,
3  the Court finds that the first public-interest factor enumerated above supports transferring the case
4  to the Norther District of Texas.  Moreover, 15 U.S.C. § 6851 is a recently enacted statute, and the
5  issues raised in this case are novel.  The Court, for example, found only two cases which have
6  discussed 47 U.S.C. § 230 in the context of the NCII Statute. *See Doe v. Spencer*, No. 1:23-cv-
7  00002, 2023 WL 4162671, at *5 (M.D. Tenn. June 23, 2023); *see also Doe Williams v. Williams*,
8  No. 3:24-cv-00165, 2024 WL 2805642, at *3 (S.D. Miss. May 31, 2024).  The Court finds no
9  particular interest in the lawsuit or a familiarity with the governing law to render the Northern
10 District of California better suited than the Northern District of Texas for resolving this litigation.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants' motion to transfer to the U.S. District Court for the Northern District of Texas.

The Clerk is ordered to transfer the action forthwith to the Northern District of Texas.

As such, ECF 7 and 23 are denied without prejudice as **MOOT**.

This Order resolves ECF 24.

IT IS SO ORDERED.

Dated: November 5, 2025

_____
TRINA L. THOMPSON
United States District Judge

Government Shutdown:
10/1/25 midnight to present

13